JODI LINKER, Bar Number 230273
Federal Public Defender
Northern District of California
ANGELA CHUANG, Bar Number 313445
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:   (415) 436-7700
Facsimile:    (415) 436-7706
Email:         Angela_Chuang@fd.org


Counsel for Defendant Lopez-Cruz

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 24–622 CRB |
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM** |
| v. | **Court:**          Courtroom 6, 17th Floor |
| BRAYAN ADONY LOPEZ-CRUZ, | **Hearing Date:**   April 30, 2025 |
| Defendant. | **Hearing Time:**   10:00 a.m. |

1

**INTRODUCTION**

2    Brayan Lopez-Cruz comes before the Court for sentencing for street-level drug activity that he

3  deeply regrets and that he engaged in to support his family. Mr. Lopez-Cruz grew up in Honduras, a

4  country marked by turmoil and unrest that has created an environment in which vast swaths of the

5  country's population—including his family—live in abject poverty. While growing up, his family

6  struggled financially and often could not afford enough food or clothing. As a child, he had to begin

7  working in the coffee fields when he was nine years old in order to help supplement his family's

8  income. After a few unsuccessful attempts to immigrate to the United States in search of greater

9  economic opportunity that was not available to him in Honduras, which resulted in misdemeanor

10  immigration convictions, Mr. Lopez-Cruz successfully entered the U.S. in 2020. He then encountered

11  difficulties finding enough work to cover his own expenses as well as to help with his family's needs,

12  and made the regrettable decision to turn to selling drugs in the streets. He will face substantial

13  immigration consequences as a result of the instant matter. For low-level drug activity, he will not

14  only be subject to near-certain deportation back to Honduras, but will be ineligible for numerous

15  avenues of relief in immigration proceedings and will become permanently inadmissible to the

16  United States in the future.

17    Mr. Lopez-Cruz takes responsibility for his actions and has done so from the time of his arrest.

18  He was prepared to plead guilty immediately after his initial appearance on this matter. Engaging in

19  street-level drug sales was a poor decision that he regrets—one that he made because he felt

20  enormous pressure to find some way to make money to support himself and his family. He

21  respectfully requests that the Court impose a sentence of fifteen months to be followed by three years

22  of supervised release. Such a sentence is appropriate based on the factors delineated in 18 U.S.C. §

23  3553(a).

24

**ARGUMENT**

25  **I.    A Sentence Of Fifteen Months Would Be Sufficient But Not Greater Than Necessary To Achieve The Sentencing Goals Of § 3553(a)**

26

27    In sentencing Mr. Lopez-Cruz, this Court must consider all of the directives set forth in 18

U.S.C. § 3553(a); the Guidelines are only one factor among many to be considered by the Court. *See*

28

*United States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United States*, 128 S. Ct. 558, 570

1   (2007). "The overarching statutory charge for a district court is to impose a sentence sufficient, but

2   not greater than necessary" to achieve the goals of § 3553(a). *United States v. Carty*, 520 F.3d 984,

3   991 (9th Cir. 2008) (internal quotations omitted). Those goals include the need to: (1) reflect the

4   seriousness of the offense; (2) promote respect for the law; (3) provide just punishment for the

5   offense; (4) afford adequate deterrence to criminal conduct; (5) protect the public from further crimes

6   of the defendant; and (6) provide the defendant with needed educational or vocational training,

7   medical care, or other correctional treatment in the most effective manner. *See* 18 U.S.C. §

8   3553(a)(2). Section 3553(a) also directs the Court to consider a number of additional factors,

9   including: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of

10  the defendant, § 3553(a)(1); the kinds of sentences available, § 3553(a)(3); the sentencing guideline

11  range, § 3553(a)(4); pertinent Sentencing Commission policy statements, § 3553(a)(5); the need to

12  avoid unwarranted sentencing disparities, § 3553(a)(6); and the need to provide restitution to any

13  victims of the offense, § 3553(a)(7).

14          Mr. Lopez-Cruz agrees with the Guidelines calculation in the Presentence Report ("PSR"), with

15  a final offense level of 25 and a Criminal History Category of V, yielding an advisory Guidelines

16  range of 100–125 months. ¶¶ 28, 37, 62.

17      **A.      The nature and circumstances of the offense**

18          Mr. Lopez-Cruz was arrested as part of the government's new initiative targeting cases arising

19  in the Tenderloin for federal prosecutions, many of which involve relatively minor drug offenses that

20  normally would be prosecuted only at the state level. Along those lines, Mr. Lopez-Cruz's conduct in

21  the instant matter consisted of street-level drug dealing, and possession of additional drugs in

22  backpacks that comprised his stash for his sales. *See* PSR ¶¶ 6–12. Across the two incidents, the total

23  quantity of drugs involved was 385.3 grams of fentanyl, 45.4 grams of heroin, 69.1 grams of meth,

24  and 34.6 units of alprazolam. *See id.* These quantities represent gross weights that include the weight

25  of packaging; thus, the net weight of the drugs would be less than those figures. This was a

26  quintessential street-level drug offense that did not involve violence, weapons, possession of

27  particularly large quantities of controlled substances, or other aggravating factors. When placed in

28  perspective, Mr. Lopez-Cruz's offense is relatively minor, and accordingly does not warrant

1    additional time in custody beyond fifteen months.

2        From the inception of the case, Mr. Lopez-Cruz has consistently and unwaveringly taken

3    responsibility for his actions, and deeply regrets his involvement in the drug trade. He understands

4    that circulating these substances, particularly fentanyl, can have serious and tragic consequences. It

5    was never his intention to harm anyone. The government will likely point out that fentanyl and

6    resulting overdoses have become a concerning problem throughout the Bay Area in the past several

7    years. Mr. Lopez-Cruz does not disagree with that premise nor does he seek to excuse or justify his

8    own conduct in selling drugs, including fentanyl. But it is important to also consider the reality of his

9    relative culpability in the context of the broader fentanyl and opioid epidemic. He was a low-level

10   dealer who sold drugs on the street. He was not a drug kingpin or anything close to that level in the

11   distribution chain. He did not choose the type of drug that users would want or ask him to obtain. He

12   was not responsible for determining which drugs would be imported into or manufactured in the U.S.

13   for sale. As a low-level dealer, the larger factors of what particular drug happened to be in vast

14   supply and/or demand at any given point in time were not within his control. Nonetheless, he

15   recognizes that participating in the distribution of any drug even at the street level perpetuates the

16   circulation of illicit and potentially dangerous substances in the community.

17       Mr. Lopez-Cruz waived indictment and signaled early on that he wished to take responsibility

18   for his conduct by entering into a plea agreement with the government, and did so expeditiously

19   without filing any motions.

20       **B.        The history and characteristics of Mr. Lopez-Cruz**

21       By now, the Court is no doubt familiar with the widespread poverty, lack of opportunity, and

22   violence that plagues people living in Honduras and that has caused many of them to travel to the

23   United States in search of a better life. Mr. Lopez-Cruz's life and background presents yet another

24   example of this same sad pattern. He is originally from Honduras, where he has spent the majority of

25   his life. He grew up in impoverished conditions. *See* PSR ¶ 44. His family of six lived in a one-

26   bedroom residence with no electricity. *Id.* Despite his father working in coffee fields to support the

27   family, they struggled financially and often did not have enough resources to provide for basic needs

28   such as food and clothing. *Id.* What food they did have usually consisted of only beans and rice, with

1    occasional eggs from their chickens as a special treat. *See id.* Because of the family's poverty, Mr.

2    Lopez-Cruz had to begin working in the coffee fields with his father at the age of nine to help

3    supplement the family's income. *Id.* Work of this nature is an unskilled, low-paying job that takes

4    great physical toll on those who perform it. Sadly, it is common for children in Honduras to take on

5    this backbreaking work at a young age due to the level of poverty experienced by many in the

6    country. When he was just 12 years old, Mr. Lopez-Cruz witnessed his uncle's violent murder at the

7    hands of unknown attackers driven by unknown motives. *See id.* ¶ 46.

8         Life in Honduras did not improve for Mr. Lopez-Cruz as he became an adult and started his

9    own family, including his two older children. *See id.* ¶ 49. If anything, that put even more strain on

10   Mr. Lopez-Cruz to provide for additional loved ones for whom he was responsible. It was in search

11   of improved economic opportunity that could lead to a better life for his family that he came to the

12   United States, much like many others with similar backgrounds have been compelled to do by the

13   poor conditions in their home countries. His first attempts to enter the U.S. were unsuccessful, as he

14   was stopped at the border before he made it into the country. Those contacts led to his misdemeanor

15   immigration convictions of illegal entry in 2017 and 2018. *See id.* ¶¶ 31–32. They do not represent

16   incidents where he successfully entered the U.S. only to be deported thereafter. The only time he

17   made it into the U.S. was in 2020, and he has been here continuously since. For most of those years,

18   he resided in the Bay Area but for roughly eight months that he spent in Seattle in 2022. *See id.* ¶¶ 43,

19   56. During that time, Mr. Lopez-Cruz worked as a painter with his brother-in-law and significantly,

20   did not sustain any arrests or criminal convictions. But that stretch of employment was the exception

21   and not the norm for Mr. Lopez-Cruz in this country. For the most part, he could not find enough

22   steady work to pay for his own living expenses while also continuing to financially support his family

23   as he was expected to do. Because of those difficulties, he regrettably turned to selling drugs in the

24   streets to earn money, which led to additional state court convictions and the instant federal case.

25   Doubtless, his involvement in selling drugs exhibits incredibly poor judgment, which he readily

26   acknowledges.

27        It is almost certain that Mr. Lopez-Cruz will be deported following resolution of the instant

28   matter. Prior to his deportation, he would spend an uncertain period of time in immigration

detention—a time period that could easily stretch to months—which would serve as an additional custodial consequence of his conduct beyond the sentence in this case. His prior deportations occurred prior to his sustaining aggravated felony convictions that are now on his record and would expose him to significantly harsher sentences if he were to re-enter unlawfully again. Unlike his prior state court convictions, Mr. Lopez-Cruz will go straight into immigration custody for deportation following his sentence in this matter. An ICE detainer has already been lodged against him and unlike state facilities where he has been in custody in the past, there is no possibility that a federal prison would not turn him over to ICE.

All of his attempts to come the U.S., successful or not, involved a long, dangerous journey from Honduras to the U.S. border. It would take him over a month of riding on top of trains, a particularly dangerous form of transportation that many migrants resort to because they cannot afford anything else. Mr. Lopez-Cruz witnessed others falling off the train, including one that was then run over. He was also the victim of armed robberies multiple times by assailants with guns and knives, who stole the few belongings that he had. This perilous journey is only worth undertaking if there is improved economic opportunity waiting on the other side to justify it. These last few years have shown Mr. Lopez-Cruz that such expectations are naïve and unrealistic, as he could not find well-paying steady work here and instead found himself struggling financially again. He had not experienced those difficulties at the time of his prior deportations because he had not made it into the country.

Deportation also means something different now than it did before. Immigration consequences have become all the more salient and severe in recent months under the Trump administration. There has been a sea change in the federal government's immigration policies and how they are conducting deportations, which have profoundly impacted migrants' decisions to enter the country unlawfully. Deportations are no longer carried out as they once were, generally involving a flight back to one's home country. Instead, deportations now involve the very real possibility that one will instead be sent to spend an indeterminate amount of time in horrific conditions in prisons in authoritarian third countries such as El Salvador with no access to due process and little regard for basic human rights. Indeed, it apparently is the federal government's official position that U.S. federal courts have no

1  jurisdiction to redress any claims made by individuals that the government has sent to El Salvador.

2  Accordingly, the risks and consequences associated with illegal entry into the U.S. have increased

3  exponentially, and have reshaped the calculus for those who would consider doing so.

4  Mr. Lopez-Cruz has no desire whatsoever to put himself in a position where he could be

5  deported to notoriously inhumane prisons in El Salvador or elsewhere with seemingly no legal

6  recourse. As difficult as life can be in his home country of Honduras, there is no question that it is far

7  preferable to jail anywhere else. He knows that he cannot help his family if he is incarcerated. His

8  longest prior sentence is two years in custody, which was likely served at half-time in the state

9  system. A sentence of fifteen months would mean that his actual serving time would be longer than

10  he has served before. And he understands that should he return to the country and engage in criminal

11  conduct again, the custodial consequences will only become more and more severe. Upon his return

12  to Honduras, he will do the best he can to support his loved ones by returning to agricultural work.

13  There, he will be reunited with his two older children who he has not seen in over five years. And the

14  mother of his younger children who were born here in the U.S is already beginning to plan and make

15  arrangements to obtain passports for their children so that she can bring them to visit him in

16  Honduras.

17  **C.    The need to avoid unwarranted sentencing disparities**

18  A sentence of fifteen months also would be more in line with sentences that have been imposed

19  in other street-level drug cases that have been prosecuted as part of the government's Tenderloin

20  initiative, including some with similar or even more drug weight. To point to a few specific examples

21  that are by no means exhaustive:

22  - The defendant in *United States v. Melendez-Soto*, CR 23–322 EMC, possessed over 500

23  net grams of fentanyl and over 100 net grams of meth, among other things—

24  significantly more controlled substances than Mr. Ramos Aguilar had here. Mr.

25  Melendez-Soto's Guidelines range was 87–108 months. He was sentenced to time

26  served after spending approximately two months in custody.

27  - The defendant in *United States v. Jorge Caseres-Gonzalez*, CR 24-539 TLT, possessed

28  approximately 320 grams of fentanyl and had a prior state court felony drug conviction

with a 3-years sentence. His Guidelines range was 63–78 months. He was sentenced to time served plus one day after spending approximately five weeks in custody.

- The defendant in *United States v. Brayan Josue Murillo-Garcia*, CR 25–29 TLT, had at least four prior deportations, but possessed very small quantities of drugs in his federal case. His Guidelines were 10–16 months. He was sentenced to time served plus one day after spending approximately six weeks in custody.

## CONCLUSION

For all the reasons set forth above, Mr. Lopez-Cruz respectfully requests that the Court impose a sentence of fifteen months served with three years of supervised release. Such a sentence is sufficient but not greater than necessary to achieve the sentencing goals laid out in § 3553(a).


Dated:     April 23, 2025                          Respectfully submitted,

                                                   JODI LINKER
                                                   Federal Public Defender
                                                   Northern District of California


                                                            /S
                                                   ANGELA CHUANG
                                                   Assistant Federal Public Defender